540 S.E.2d 569

Donald E. INGRAM, Jr., Plaintiff Below, Appellee,

v.

The CITY OF PRINCETON, A West Virginia Municipal Corporation, Defendant Below, Appellant.

No. 26351.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 12, 2000.

Decided July 12, 2000.

Concurring and Dissenting Opinion of Justice Starcher July 12, 2000.

Fred F. Holroyd, Scott Evans, Holroyd, Yost & Evans, Charleston, for Appellant.

Dennis R. Vaughan, Jr., April Robertson Boughton, Vaughan Law Firm, Charleston, for Amicus Curiae, West Virginia Municipal League, Inc.

R. Thomas Czarnik, Princeton, for Appellee.

PER CURIAM:

The City of Princeton, appellant/defendant (hereinafter referred to as "City"), appeals an adverse jury verdict rendered in the Cir-

cuit Court of Mercer County. The City was sued by a former employee, Donald E. Ingram, Jr., appellee/plaintiff (hereinafter referred to as "Mr. Ingram"), for unused sick leave pay that accrued during his employment with the City. The City assigns as error that: (1) the Wage Payment and Collection Act does not apply to a government employer, (2) the City had an unwritten policy of not paying unused sick leave to police officers, (3) the circuit court committed error in refusing to give two of the City's proffered jury instructions, and (4) the circuit court committed error in awarding attorney's fees and costs.[1] Based upon the parties' arguments on appeal, the record designated for appellate review, and the pertinent authorities, we reverse the decision of the Circuit Court of Mercer County.

## I.

### FACTUAL BACKGROUND

Mr. Ingram was employed by the City as a police officer for approximately ten years. On or about July 8, 1997, Mr. Ingram resigned his employment with the City.[2] When Mr. Ingram resigned, he requested payment for all unused sick leave that he had accrued. It was determined that his accumulated sick leave amounted to 99 days and 3 hours. The City refused to pay Mr. Ingram for his unused sick leave based upon the City's unwritten policy of not paying unused sick leave wages to police officers who leave their employment with the City.

Thereafter, Mr. Ingram filed the instant suit against the City under the West Virginia Wage Payment and Collection Act, W. Va. Code § 21-5-1, et seq. (hereinafter referred to as "the Act"). In his complaint, Mr. Ingram alleged that the Act required the City to pay him for all accrued unused sick leave

upon his resignation. The City's primary defense was that because it had not agreed, either expressly or impliedly, to pay unused sick leave as separation pay the Act did not require such payment. Following a trial of the matter, the case was submitted to a jury, and a verdict was returned in favor of Mr. Ingram.[3] The City then filed post-trial motions which the circuit court denied. From these adverse rulings, the City now appeals.

## II.

### STANDARD OF REVIEW

■ The applicable general standard of review in this case was set out by this Court in Syllabus point one of *Alkire v. First National Bank,* 197 W.Va. 122, 475 S.E.2d 122 (1996):

In reviewing a trial court's denial of a motion for judgment notwithstanding the verdict, it is not the task of the appellate court reviewing facts to determine how it would have ruled on the evidence presented. Its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below. Thus, in ruling on a denial of a motion for judgment notwithstanding the verdict, the evidence must be viewed in the light most favorable to the nonmoving party. If on review, the evidence is shown to be legally insufficient to sustain the verdict, it is the obligation of the appellate court to reverse the circuit court and to order judgment for the appellant.[4]

*See* Syl. pt. 1, *Tudor v. Charleston Area Med. Ctr., Inc.,* 203 W.Va. 111, 506 S.E.2d 554 (1997). We have also previously held that

[i]n determining whether the verdict of a jury is supported by the evidence, every reasonable and legitimate inference, fairly

1. An amicus brief was filed by the West Virginia Municipal League, Inc., urging reversal of the judgment.

2. Mr. Ingram resigned his employment with the City in order to accept employment in another state.

3. The jury awarded Mr. Ingram $6,956.25 for wages, *i.e.*, accrued unused sick leave; $2,100.00 in liquidated damages; $849.23 in prejudgment

interest; $4,444.00 in attorney's fees; and $366.84 in costs.

4. "We note that the designation of a Rule 50(b) motion as a 'motion for judgment notwithstanding the verdict' has been changed to a 'judgment as a matter of law' in the amendment of Rule 50 effective April 6, 1998." *Miller v. Triplett,* 203 W.Va. 351, 356 n. 8, 507 S.E.2d 714, 719 n. 8 (1998).

arising from the evidence in favor of the party for whom the verdict was returned, must be considered, and those, facts, which the jury might properly find under the evidence, must be assumed as true.

Syl. pt. 3, *Walker v. Monongahela Power Co.,* 147 W.Va. 825, 131 S.E.2d 736 (1963). Thus, under this standard, we construe the evidence in the light most favorable to the plaintiff who prevailed below.

## III.

## DISCUSSION

### A. Application of the Wage Payment and Collection Act to Government Employers

■ The City first contends that the Act is not applicable to it as a municipality and therefore, the circuit court was without jurisdiction. In contrast, Mr. Ingram asserts that the City failed to present this contention to the trial court. "Typically, we have steadfastly held to the rule that we will not address a nonjurisdictional issue that has not been determined by the lower court." *State ex rel. Clark v. Blue Cross Blue Shield of West Virginia, Inc.,* 203 W.Va. 690, 699, 510 S.E.2d 764, 773 (1998). *See* Syl. pt. 2, *Trent v. Cook,* 198 W.Va. 601, 482 S.E.2d 218 (1996); Syl. pt. 3, *Voelker v. Frederick Bus. Properties Co.,* 195 W.Va. 246, 465 S.E.2d 246 (1995). However, the issue asserted by the City "is one of jurisdiction, which may be raised for the first time on appeal." *Jan–Care Ambulance Serv., Inc. v. Public Serv. Comm'n of West Virginia,* 206 W.Va. 183, 188 n. 4, 522 S.E.2d 912, 917 n. 4 (1999). *See* Syl. pt. 6, *State ex rel. Hammond v. Worrell,* 144 W.Va. 83, 106 S.E.2d 521 (1959) ("Lack of jurisdiction may be raised for the first time in this court, ... and may be taken notice of by this court on its own motion."(internal quotations and citations omitted)).

The crux of the City's argument is that, under the wage payment and collection provisions of the Act, the term "employer" is not defined to mean a government employer. W. Va.Code § 21–5–1(m) (1996) states that

"[t]he term 'employer' means any person, firm or corporation employing any employee." Thus, the City contends that since this definition does not expressly state that a government entity is included in the definition of employer, the wage payment and collection provisions of the Act do not apply to the City.

In support of its argument, the City cites to the definition of employer used in the polygraph section of the Act[5]. Under W. Va.Code § 21–5–5a(1) (1996) "employer" is defined as follows:

"Employer" means any individual, person, corporation, department, board, agency, commission, division, office, company, firm, partnership, council, or committee *of the state government;* public benefit corporation, public authority or political subdivision *of the State,* or other business entity, which employs or seeks to employ an individual or individuals.

(Emphasis added).

Thus, the City argues that because the wage payment and collection definition of employer does not include within its scope governmental entities as does the polygraph definition of this term, the Legislature did not intend the wage payment and collection provisions to apply to government employers.

We are unpersuaded by the City's argument that the expansive definition of employer provided in the polygraph section of the Act indicates a legislative intent to limit the definition of employer under the wage payment and collection provisions of the Act. A review of the legislative history of W. Va. Code § 21–5–1 reveals the following facts. The Legislature originally enacted this statute in 1917 and made it applicable only to railroad companies. *See* 1917 Acts of the West Virginia Legislature, ch. 50, § 1. A subsequent amendment to the statute in 1923 continued the statute's limited applicability to railroad companies. *See* 1923 Acts of the West Virginia Legislature, ch. 54, § 71n. In 1975, the Legislature substantially amended this provision and expanded its application to

---

**5.** The polygraph provisions of the Act place guidelines on the use of lie detector tests against employees.

include the term "firm," which was broadly defined to include "any partnership, association, joint-stock company, trust, division of a corporation ... or officer thereof, employing any person." *See* 1975 Acts of the West Virginia Legislature, ch. 147; The term "employer" did not appear in the statute until amendments thereto enacted in 1981. *See* 1981 Acts of the West Virginia Legislature, ch. 212. At that time, the term "employer" was defined, as it is under the current statute, to mean "any person, firm or corporation employing any employee." We find it relevant that the definition of employer added by the Legislature in 1981, actually added only one new matter, which was the undefined term "person" at the beginning of the definitional language. Thus, the true issue is whether the State and its subdivisions were intended by the Legislature to come within the meaning of the term "person." [6]

While many cases decided under the wage payment and collection provisions of the Act have primarily involved nongovernmental employers, we nevertheless have had occasion to construe these provisions in cases involving government employers. In *Lipscomb v. Tucker County Commission (I)*, 197 W.Va. 84, 475 S.E.2d 84 (1996) (hereinafter referred to as "*Lipscomb I*"), we applied the wage payment and collection provisions of the Act against the Tucker County Commission. In *Lipscomb (I)* the Tucker County Commission, which attempted to circumvent the Act by using the statute of limitations as a bar to the plaintiff's claim. We rejected the defense, holding, in Syllabus point 4, that "[a] claim for unpaid wages under the West Virginia Wage and Payment Collection Act is a continuing claim, and, therefore, a separate cause of action accrues each payday that the employer refuses to pay the wages claimed." 197 W.Va. 84, 475 S.E.2d 84. *See Lipscomb v. Tucker County Com'n (II)*, 206 W.Va. 627,

527 S.E.2d 171 (1999) (hereinafter referred to as "*Lipscomb II*"); *Lawson v. County Com'n of Mercer County*, 199 W.Va. 77, 483 S.E.2d 77 (1996) (per curiam) (implicitly recognizing application of Act to county).

Moreover, we have previously indicated that courts "may venture beyond the plain meaning of a statute in the rare instances ... in which a literal application would defeat or thwart the statutory purpose; or in which a literal application of the statute would produce an absurd or unconstitutional result." *State ex rel. Frazier v. Meadows*, 193 W.Va. 20, 24, 454 S.E.2d 65, 69 (1994) (citations omitted). To accept the City's limitation on the meaning of employer under the wage payment and collection provisions of the Act would lead to such a prohibited result and such would invoke constitutional equal protection concerns. In the final analysis, "[t]he West Virginia Wage Payment and Collection Act is remedial legislation designed to protect [all] working people and assist them in the collection of compensation wrongly withheld." Syllabus, *Mullins v. Venable*, 171 W.Va. 92, 297 S.E.2d 866 (1982).[7] Accordingly, we do not hesitate to find that the Legislature did not intend to bind private employers to certain wage payment and collection guidelines designed to protect workers, yet exclude State and political subdivision workers from such protections. Rather, we conclude that the Legislature intended its statutory wage payment and collection guidelines to apply to both governmental and nongovernmental employers alike.

### B. The City had an Unwritten Policy of Not Paying Unused Sick Leave to Police Officers

The City next argues that, under the Act, unused sick leave is not a mandatory fringe

---

**6.** In a recent decision by this Court, *State v. Zain*, 207 W.Va. 54, 528 S.E.2d 748 (1999), we were confronted with the analogous issue of whether the term "person," as used under the general fraud statute, included the State. Without hesitation this Court found that the Legislature intended to include the State and its political subdivisions as "persons" entitled to protection from fraud. *See* Syl. pt. 3, *id.*

**7.** Similarly, in *State ex rel. Crosier v. Callaghan*, 160 W.Va. 353, 236 S.E.2d 321 (1977), it was

argued that the civil enforcement provision of our Minimum Wage and Maximum Hours Act, W. Va.Code § 21–5C–8 (1996), did not apply to the State and its political subdivisions because the statute did not expressly define "employer" to include the State and its political subdivisions. This Court rejected the argument and found that the civil enforcement provision could be invoked against either the State or its political subdivisions.

benefit which must be paid upon an employee's separation from employment. Consequently, the City argues that for Mr. Ingram to be entitled to be paid for unused sick leave under the Act, there had to be an express agreement between the parties that such payment would be made upon separation. The City further contends that it had an unwritten policy that prohibited payment of unused sick leave to police officers who left the City's employment.

In contrast, Mr. Ingram argues that the Act is applicable because the employee handbook issued by the City is silent on the issue of the payment of unused sick leave. He further contends that there must be an express written statement indicating unused sick leave is not to be paid as a fringe benefit. Since no such statement exists, he is entitled to the payment of this benefit.

■ This Court recently addressed the issue of payment of unused fringe benefits in *Meadows v. Wal–Mart Stores, Inc.,* 207 W.Va. 203, 530 S.E.2d 676 (1999). We indicated in *Meadows* that the Act did not make payment of fringe benefits mandatory, and that the terms and conditions of fringe benefits were controlled by the agreement between the employer and employee. *Meadows* specifically held that "the terms of employment may ... provide that unused fringe benefits will not be paid to employees upon separation from employment." Syl. pt. 5, in part, *id.* In Syllabus point 6 of *Meadows* we stated:

> Terms of employment concerning the payment of unused fringe benefits to employees must be express and specific so that employees understand the amount of unused fringe benefit pay, if any, owed to them upon separation from employment. Accordingly, this Court will construe any ambiguity in the terms of employment in favor of employees.[8]

207 W.Va. 203, 530 S.E.2d 676 (1999) (footnote added).

During the proceedings before the trial court, the evidence was undisputed that the City did not have a written statement on the issue of the payment of unused sick leave. Furthermore, the facts developed during the trial indicated that the City had an unwritten policy of *never paying* unused sick leave to separated police officers. Thus, no ambiguity was shown to exit regarding the existence and terms of this unwritten policy. In fact, Mr. Ingram acknowledged during the trial that he was fully aware of the unwritten policy. There was no evidence of *any* police officer ever having been paid unused sick leave upon his/her separation of employment with the City. During the direct examination of Mr. Ingram, by his own counsel, the following exchange occurred:

Q. Now were you aware during the time that you were employed by the City of Princeton that upon retirement by other officers or by practice of the City that they were not getting paid sick leave when they quit or retired?

A. Yes.

Q. And did you protest to anybody because over the ten years or so you worked that say, this policy isn't right?

A. It was discussed, we always discussed ways it could be changed but until someone actually ended their employment or retired to press the issue we didn't have—

Q. Were there other officers who retired or quit the force while you were still employed there?

A. Yes sir.

Q. And do you know what happened in so far as those officers accumulated sick pay?

A. One in particular decided to just take his sick days as they were given to him. He'd call in sick pretty regular for some period of time making sure he didn't loose [sic] out on his sick days.

In view of the uncontroverted evidence on this issue, we believe the terms of employ-

---

**8.** Likewise, in *Lipscomb II* we were called upon to reiterate the effect of ambiguity in written employment agreements that addressed specific fringe benefits. We held in Syllabus point 2 of *Lipscomb II* that "[w]here an employer pre-scribes in writing the terms of employment, any ambiguity in those terms shall be construed in favor of the employee." 206 W.Va. 627, 527 S.E.2d 171 (1999).

ment between the City and Mr. Ingram did not obligate the City to pay him unused sick leave upon his separation from employment. Stated simply, there was no ambiguity in the terms of his employment. Therefore, the Act could not be used to enforce the payment of Mr. Ingram's unused sick leave. Thus, it was reversible error for the trial court to deny the City's post-trial motion for judgment as a matter of law.[9]

## IV.

## CONCLUSION

In view of the foregoing, we reverse the decision of the Circuit Court of Mercer County and order judgment be entered for the City.

Reversed.

STARCHER, Justice, concurring in part and dissenting in part.

(Filed July 12, 2000)

I agree with the majority's conclusion that the Wage Payment and Collection Act, *W.Va. Code*, 21–5–1, *et seq.*, applies to governmental and nongovernmental employers alike.

I disagree, however, with the majority's application of the Act to appellee Donald E. Ingram's situation. The Legislature designed the Wage Payment and Collection Act to help working people in the collection of compensation for services rendered. Through the Act, the "legislature has attempted to prevent employers from abusing their positions by compromising the wages of employees." *Britner v. Medical Security Card, Inc.*, 200 W.Va. 352, 355, 489 S.E.2d 734, 737 (1997) (*per curiam*). The Act "requires employers to pay the wages of working people who labor on their employer's

behalf." *Mullins v. Venable*, 171 W.Va. 92, 96, 297 S.E.2d 866, 871 (1982).

*W.Va.Code*, 21–5–1(c) [1987] specifically says that "the term 'wages' shall also include then accrued fringe benefits capable of calculation and payable directly to an employee[.]" The statute goes on to state that "sick leave" is included as a "fringe benefit." [1] Stated simply, Mr. Ingram worked for his employer, and as part of his compensation for his services he accrued sick leave, a fringe benefit that the Act considers to be wages.

The Act defines "wages" as including sick leave, and specifies that employers are to pay wages to each employee when the employee ceases his or her employment. The majority opinion, however, holds that whether sick leave is payable as a wage is determined, not by the law, but by the employment contract. The majority opinion concludes that the City of Princeton's unwritten policy to never pay police officers for their unused sick leave when they quit or retired governs the definition of "wages" due to Mr. Ingram.

The majority's position is absolutely backwards. The statutes enacted by the Legislature control every employment contract that is entered into in West Virginia; the majority opinion is simply wrong in holding that the employment contract trumps the law. We held, in Syllabus Point 2 of *Huntington Water Corp. v. City of Huntington*, 115 W.Va. 531, 177 S.E. 290 (1935), that:

All general legal principles affecting contracts enter by implication into and form a part of every contract, as fully as if specifically expressed therein.

---

9. The City's remaining assignments of error need not be reached in view of our decision on this issue.

1. *W.Va.Code*, 21–5–1(c) and (1) [1987] define "wages" and "fringe benefits" in the following manner:

(c) The term "wages" means compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation.... [T]he term "wages" shall also include then accrued fringe benefits capable of calculation and payable directly to an employ-

ee: Provided, That nothing herein contained shall require fringe benefits to be calculated contrary to any agreement between an employer and his employees which does not contradict the provisions of this article.

\* \* \* \* \* \*

(1) The term "fringe benefits" means any benefit provided an employee or group of employees by an employer, or which is required by law, and includes regular vacation, graduated vacation, floating vacation, holidays, sick leave, personal leave, production incentive bonuses, sickness and accident benefits and benefits relating to medical and pension coverage.

In other words, the definition of "wages" in the Wage Payment and Collection Act is a part of every employment contract, including the contract between the parties to this case.

Furthermore, West Virginia law requires that employers put in writing the wages and fringe benefits that are to be paid to employees. The Act specifically says that an employer's sick leave policy must be "in writing," so as "to spare workers from trying to hit an ever-moving target." *Robertson v. Opequon Motors, Inc.*, 205 W.Va. 560, 566, 519 S.E.2d 843, 849 (1999) (*per curiam*). *W.Va.Code*, 21–5–9 [1975] states that:

> Every person, firm and corporation shall: . . .

> (3) Make available to his employees in writing or through a posted notice maintained in a place accessible to his employees, employment practices and policies with regard to vacation pay, sick leave, and comparable matters.

It is undisputed in this case that the City of Princeton's policy regarding sick leave—that it never paid sick leave to an employee whose job terminated—was unwritten. That means the policy was in violation of law, and should be unenforceable. Yet the majority suggests that because many police officers like Mr. Ingram knew about the unwritten policy through word of mouth, this breach of the law is excusable.

I believe that when the City of Princeton chose to redefine "wages" in its unwritten policy that excluded sick leave from payable fringe benefits, it refused to pay Mr. Ingram a fringe benefit for which he worked and that he earned. This refusal to pay Mr. Ingram the wages he earned through the use of an unwritten policy plainly violates the Act.

I therefore dissent to the majority opinion's conclusion to deny Mr. Ingram his wages. I am authorized to state that Justice McGraw joins in this separate opinion.